Thank you, Your Honors. If possible, I'd like to reserve six minutes for rebuttal. My name is Gwendolyn Payton. I represent Premera Blue Cross Blue Shield of Alaska. Your Honors, this is a serious case about the confinement of a child at a residential treatment center, a significant and serious action in the life of a child. This particular child was confined for 18 months at this residential treatment center. It is also a case about an example of the robust review that ERISA claim members receive when seeking benefits under their ERISA plan. This particular claim received ample due process and multiple reviews. Indeed, this claim received four levels of administrative review. Every single one of those reviews concluded that Lillian's confinement at the residential treatment center was not medically necessary. At every level of review, the members were invited to submit whatever information and evidence they wished to submit. Two of these appeals were done by independent child psychologists with no affiliation with Premera at all. The last one of these reviews was mandated by the Affordable Care Act and done by an independent review organization, which again signed it to a completely independent child psychologist, who again determined, as did every other reviewer looking at this claim, that Lillian's confinement was not medically necessary. Let me ask you this. I'm certainly no physician, but my understanding of the facts in this case is that Lillian was self-harming. He got some transgender kinds of issues. He was apparently deeply troubled. He or she was deeply troubled, was self-harming for some significant period of time. All of that may have stopped, and that may be part of a problem we need to deal with here, but it seems to me that the insurance companies are taking the position that, you know what? He got this problem. That's his problem. He can get it treated somewhere else. He doesn't have to be around these specialized care people and so on. I don't understand why the district judge, at least up to I think it was June 2014, why was the district judge wrong about the care that was given to this young person? First of all, this is a breach of contract action, Your Honor, and so you have to look at the terms of the contract and find coverage under the contract language. The district court relied on the sixth prong in the medical policy at issue, which holds that the patient has currently stabilized from another inpatient treatment and still requires around-the-clock behavioral care. So this is referring actually to a step-down care situation where the child is coming from an inpatient treatment and is moving into the level of residential care. There's no evidence that Lillian ever came from a hospital or inpatient treatment, and so this prong just simply doesn't apply on its face. And to your point, Your Honor, about the evidence, actually when you look at the record of what the evidence is here, is there is not evidence of self-harm contemporaneous with the confinement. It is not the insurance company's position that Lillian doesn't merit care for her significant mental health issues. She does. This is a case about is she receiving the right type of care at the right level. And the position here of every reviewer who looked at it is she does need care, but she needs care at the appropriate level, which is not 24-7 confinement for 18 months. The professionals who treated her prior seem to have said, what we're doing isn't working. Residential treatment is called for. The professionals who treated her prior did not see her at the time of her confinement, and indeed the one that they rely on most had not seen Lillian for six months prior to confinement. What those providers say is, we think residential care would be good for Lillian, but that is not the standard. The standard is, is there evidence that it is medically necessary at that level and that she cannot be treated. I thought Dr. Brookbank saw her at the time of her confinement. She was in this facility before the coverage dispute began. Correct. Dr. Brookbank, go ahead. Dr. Brookbank is the one and only psychologist who examines Lillian at any time with a comprehensive evaluation at all during her confinement. Dr. Brookbank sees Lillian six weeks after she has been confined. So that tells you in and of itself that the facility itself did not believe that her condition was serious enough even to get her a psychological examination, a single psychological examination for six weeks after they are confining her 24-7. Why would they need to do that? She's at their facility. I don't find that six weeks is such a delay. Your insurance dispute doesn't kick in for another month and a half or two months. You're arguing now that the care that she was receiving was not medically necessary. We have to look for coverage at the medical guideline to answer that question. To do that analysis, you have to examine her. To put her in a setting of this level of intensity, you need, as a professional, to make an initial assessment that this patient belongs here. You would not put somebody in a surgical ward who did not need surgery. You might say, hey, you can get some physical therapy for that problem, but I'm not going to operate on your leg until I've examined you. That is the level of intensity of services that this child is receiving. She cannot leave. She is monitored 24-7. She is in a very confined situation. So let's talk about what Dr. Brookbank finds six weeks after confinement. Before that, what we've been talking about before, and I don't know how to pronounce his name, he spoke specifically to that. He said it's true he hadn't seen her for some months before the actual admission to residential care. But he said, in my opinion, inpatient residential care was the only option. And goes on to refer specifically to the placement at Island View, Elements, whatever it is. His parents had exhausted all outpatient avenues and required intensive treatment to cope, so on and so forth. So that's what they had in the record. What they have in the record is a statement without medical records, without any evidence. That letter is written to support the insurance claim. It is not contemporaneous treatment of the child. And we're talking here about medical records, not advocacy for an insurance appeal. So what does Gush say is the actual evidence that she needs to be confined 24-7? Before you get to that, though, let me ask you this. We have a district judge who has made a determination, relying in part on the evidence that was just cited by my colleague. What's the standard of review here when we look at the district court's determination? Do the claimants have to prove this by preponderance of the evidence? Does it have to be clear error? What are we talking about here? What do we do with the district court's findings on this issue? The district court's question is a hybrid. So the district court first interpreted the contract, which you can review de novo, the actual interpretation of the contract language, and that is the question, does the sixth prong, which is the only prong that the district court relied on, apply to this particular situation? To the degree that the court weighed the evidence, that would be deferential review. But let me say this, and this goes back to Judge Clifton, your question. It's not an issue here about is this evidence more probative or more compelling than other evidences. Is there any evidence? Is there any finding of the criteria under the medical policy? And to make that, you have to have evidence somewhere in the record consistent with the time of confinement that Lillian was a threat to herself or to others. And that is what is missing. And that is what is missing from Dr. Gosch. What he says is twice they took her to the hospital, the hospital would not admit her. That's it. What we don't have, and this is where, Your Honor, you really need to look. There are really two documents in the administrative record that are contemporaneous with her confinement that speak to the issues in the medical policy. And this is a different question than a provider saying, you know what, I think she would benefit from being here. She may benefit from being here. But the question that you are answering is a different one, which is under the terms of the policy, is this the correct level of care for Lillian at the time? And to do that, you must look at the contract and you must look at the medical policy. And the medical policy says you must have evidence that she is a threat to herself and others and therefore justify the 24-7 confinement. So where do you look? One of the places, Your Honor, that you pointed out was Dr. Brockbank. And what Dr. Brockbank says is very important here. She affirmatively states on multiple places in that report, Lillian is not a threat of self-harm. What Lillian's problems are is PTSD related to a medical procedure that she received in the fifth grade and depression and familial conflict. And in addition, Dr. Brockbank notes that she has gender dysphoria. However, that is not a diagnosis that the facility gives her or treats her for. And in fact, it's interesting what Lillian says when she finally gets that psychological evaluation to determine is this person at a state to require 24-7 confinement, six weeks after she's been confined. And what Lillian says is, I do not belong here. I have one problem. It's that my parents do not believe I'm a girl. My parents believe that I am a boy. And that is the problem. I am not going to hurt myself. And I do not need to be locked up here. And that is important because you have to find some evidence in the record that she met the criteria. You will not. The other place that you need to look is the intake form. And that really is the magical moment, right? You bring this child to this center and say, we're going to confine you against your will. We are going to do an intake assessment. By the way, it was not done by a doctor. It was done by a social worker. The social worker affirmatively states, this child is not a threat to herself or others. The child is here because the family states that she no longer wants to be a part of our family. The child states, the problem is my parents don't believe I am a girl. And they want me here because of that issue. Now, that is not medical necessity for confinement of a child. The question of whether or not she needs 24-7 medical treatment is a different question from whether or not there are therapeutic programs that will benefit Lillian. There are. We can concede that. However, they are not covered under her insurance contract, which covers medical intervention. If she does not need the level of medical intervention, it will not be covered under her contract. And that's just an important tenet of the sustainability of our healthcare system. We cannot have a system where an actual review from a child psychologist and then hear four levels of administrative review by specialists say, this particular treatment is not medically necessary for this person. And again, they're not saying it may not benefit her or she may not get something out of a therapeutic boarding school setting. She may. It's just not medical treatment covered under our plan. And we want to save your time. Yes, I will. Thank you. You're welcome. Mr. King, please. The court, Brian King, on behalf of the plaintiffs, the police in this case. I think that you, Judge Smith, pointed out a significant issue, and that is what's the standard of review here. We are talking about federal rule of civil procedure 52. The standard of review under Kearney, it's very clear, is clearly erroneous. And that was discussed by the district court at the time the decision was made. And the court is on solid ground in stating that, that rule 52 governs this proceeding, govern the proceeding before the district court and governs this proceeding. That's a clearly erroneous standard of review in terms of what this court looks to. The district court's findings of fact. Contract interpretation is not subject to that standard, is it? That's correct, Your Honor. There's no question that there is a de novo standard of review to the extent that this court is in as good a position to evaluate, for example, the meaning of the language of the contract or the meaning of the requirements of the ERISA statute. But this case turns much more on the factual findings, or at the very most, mixed findings of fact and conclusions of law than pure conclusions of law from the district court. So, here... Usually mixed fact and law usually wind up being reviewed de novo as well. Well, I think that under Kearney, Your Honor, we briefed this. And my recollection is that Kearney makes clear that when there is a mixed finding and conclusion, there is some deference to which the district court is entitled. But most of the findings... The reality here is that the district court's findings are based on a written administrative record, aren't they? It's not like he has the benefit of watching the witnesses and making credibility assessments. We're all looking at the same pages, so... That's true, Your Honor. I don't know what you say, but I'm not sure deference is quite as complete as you might like. No, I understand. And it's an interesting situation when you're talking about a review of the record of a pre-litigation appeal process such as these ERISA cases constitute. But one of the things I think that Rule 52 is in place to do is to relieve the burden, in this case, upon the Court of Appeals... To indicate that there needs to be a time that comes and goes for the parties to present their arguments and present the facts. And for a finding to be entered by either the district court or, in this case, the Court of Appeals to do that, I suppose. But I think that in order to give Rule 52 meaning, it would be appropriate to minimize the workload of the court to defer to some extent to those... The hard work that the district court did in sorting through a very long, many thousands of pages of medical records here. So, I do think that there is some deference to which the district court is entitled. The standard of review that the district court utilized was de novo as opposed to an abuse of discretion. And I don't think that that's the case. The district court opinion referenced several occasions after April 30th, 2014, when Lillian was experiencing thoughts or urges of suicide or self-harm. She was struggling at many points. It's easy to go back and cherry-pick that record and say, well, there were many days in which she was doing relatively well. That's true. But there were also many ways in which the thorough report from Dr. Brockbank outlined that the treatment was medically necessary, that it was appropriate to follow the treatment plan that was established by the clinicians at elevations at the time this young woman was admitted and evaluated. Dr. Brockbank said that she, in fact, needed the kind of course of treatment for an extended period of time that elevations was prepared to provide and that this young woman received. What's the best record evidence that you have that Lillian's stay at elevations was medically necessary after June of 2014? There are several places in the record that talk, as I referred to Judge Smith, of ups and downs. There are references that the court notes in the record from June of 2014 where there were concerns about self-harm, suicidal ideation, urges, impulses. As time went on, that decreased. I think it's fair to say that the record improved over time. But the reality is that the treatment plan that was put together by the clinicians at the time is something that contemplated a course of treatment and a time frame that was extended. So I think that the best evidence is, in fact, the improvement of Lillian over time, that it was medically necessary. As I understand it, since the issue is what was medically necessary, are we at a point in this case where we might say, you know, before June 2014, there's quite a bit of evidence that this was medically necessary, but the district court really didn't look at it after that point where there were improvements and so on. Is this the kind of a situation where we should send at least that portion of the case back to the district judge to have an additional evidentiary hearing to determine what, if anything, occurred after June of 2014 that might distinguish it from what was appropriate prior to that time? I don't think so for this reason, Judge Smith. When you look at the sixth prong of that criteria, the medical necessity criteria that Romero was using, it uses this language. It says, the patient has currently stabilized during inpatient treatment, stayed for severe symptoms or behavior, and requires structured setting with continued around-the-clock behavioral care. That would suggest to us that, and I think it suggested to the district court, that what you were looking at was an individual who was stable, in other words, not acutely ill, not at imminent threat of harm to self or others, but was in need of long-term treatment to ensure that the stability would be incorporated and would be ending up more permanent in the basis, in the life of an adolescent in this case. But does that answer the question that your opponent puts, which is medically necessary? I understand from a delay interaction perspective it might be better, but does it, after June 2014, meet the definition of something that is medically necessary? I think it does for this reason, Your Honor. We're looking at a course of treatment and a treatment plan that involves inherently an extended period of time. These adolescents who are treated in residential treatment centers, the average length of stay is from seven to 12 months. Sometimes it's shorter. Sometimes it's longer. But in fact, when you're talking about a course of treatment that involves a well-established, well-recognized type of care, a level of care, subacute treatment at a residential treatment center that everybody dealing with this in this area of medicine and mental health care recognizes that's a standard length of course of treatment. It's improper for anyone evaluating medical necessity to recognizing that, look at the treatment plan and have the treatment plan established for an extended period of time, but then chop the treatment plan short just because you have a period of stability for the individual. Mr. King, I wanted to ask you this. You prevailed before the district court on summary judgment, but before that, you were not arguing that this coverage was medically necessary under the provision six. You were arguing that your client was entitled to coverage under less demanding guidelines. Now, I understand that the district court gave both sides notice that they wanted to have argument on provision six, but still, this wasn't what the basis for your claim was. So, along the line of what Judge Smith had said here, you know, why shouldn't this maybe go back to have the court determine it based on what you've asked for as opposed to what the court has brought before, decided this on a sua sponte basis of sorts? Well, that would be fine, Your Honor. If you want to send it back, I think we qualify under that. Those guidelines do, but the reality is we're dealing with the court's findings and conclusions that the court came to. We think that there's some doubt and question about whether this criteria that was in place for PREMERA was appropriate. We made that argument, as you know, Judge Fischer, and the court said, no, I'm not going to go down that road. I'm going to take a look at what medical necessity under the PREMERA guidelines themselves, and I'm going to find that they're satisfied. I'm fine with that result, obviously. You're fine with the result, but as somebody who's probably in the district for both of you, you're more versed in this field of law than your average district judge is. I know that the district judge here, I don't know what his caseload is, but I suspect this is routinely the case. You're certainly more versed in this field than any of the three of us are, and I know my colleagues quite well. So if you come in and argue a different case, I have to say it is a little disturbing that the court goes off on a tangent of its own. I mean, the Supreme Court chastised our court pretty publicly this spring for picking up a case and running in our own direction with it. Not to say that there's not a good argument you made, and indeed, you may well have made it, but that's not what the district court has adopted. And so I will confess some concern about proceeding down the path the district court has proceeded down, because that's not what you, somebody who plainly knows this field well, decided was the best argument to make. And he went off in his own direction. Well, he did go off in a different direction than we urged, Your Honor, but there's no question that he was on solid ground in going off in the direction that he went on, because these are Primera's own guidelines. I mean, Primera can't argue any surprise. We were gratified that even under guidelines that we thought were inappropriately stringent, the court still found that the medical evidence indicated that medical necessity was met. I'm fine with that. And so I think that we're prepared to defend it. I think that the court had ample evidence before it to say that the Primera guidelines were satisfied. But, you know, again, I think that the district court- Primera tried to introduce additional evidence to speak to that subject. I guess it came up in the form of the motion at the time of the motion for consideration. District court said, no, too late for any of this. So it's not like the court was really open for business to visit this issue. He heard oral argument. He did properly give notice to the parties that this was a subject of concern to him. But it's not quite the same as saying, OK, this is something all of you should address. Please brief it. Please submit whatever you want. He heard oral argument and decided from there. And again, that's- I feel like I'm stepping on kind of thin ice because I don't profess to know this field. And I don't have great confidence the district court knew this field that well either. Yes. Well, the fact is, though, Your Honor, the district court relied on the same criteria, medical necessity criteria, that Primera was requesting that it utilize and rely on. And just came to a different conclusion looking at the medical record. And I think that when you look at the fact that the district court acted correctly, that Primera basically ignored Dr. Clark's evaluation for no good reason. I think that was one of the reasons that the district court was very concerned. It found that there was no principled review in the way that the district court felt necessary and that fairly reflected facts in the medical record. So I think that when you look at the language of the criteria itself, when you look at the arguments that Primera has made, the idea that the sixth prong requires or states that there must be another type, a separate type or level of inpatient care before a child comes to residential treatment. The language of the sixth prong simply does not require that. Mr. King, let me ask you this question. I know that in November of 2014, by letter, that Primera denied your claim, basically saying that the treatment was not medically necessary. Yes. During the period of time, the time when you began your claim in May 2014, did they object to the continued placement of the child at that facility at that time? Well, they didn't object in the sense that they left it to the parents to do whatever they wanted with the child. But did they ever come along and say, you know, you can keep the child there, you can keep Louie in there, but we're not going to pay for it? Or was it in November when they said we're not going to pay for it? That's a good question, Your Honor. I don't know off the top of my head when the earliest date of the denial was. I'm looking at a letter on my system that says that there was that November letter that was sent, but I don't know whether that was the first notice of denial. Oftentimes, before you have a formal letter, you have a more informal explanation of benefits that's provided. I can't tell you off the top of my head with surety whether that November 18, 2014 letter was the first notice of denial or not. Okay, thank you. Unless you have other questions, Your Honor, our position is simply that there is clearly some. In fact, there is good evidence in the record to support the district court's findings and conclusions, and that in consequence of the clearly erroneous standard overview, it's appropriate to affirm the district court ruling. Very well, thank you, Mr. King. Let's hear now a rebuttal from Ms. Payton. In response to your question, Judge Fisher, the parents didn't submit the claim until the fall, so she had already been there for a significant amount of time before they even submitted that claim for preauthorization, which is required. And then you see that letter from Dr. Small, who, by the way, is a child and adolescent psychologist, saying this is not medically necessary given the records that I have here. However, if you disagree, you can appeal, and that's where you see the level one appeal that goes to Dr. Holmes, who is independent. I understand now. Okay. She had already been there. So nobody thought the sixth prong applied. And what significance of that is remember that there is a reason that Congress has enacted the requirements of ERISA and put in all of these requirements. And then on top of that, we have this Affordable Care Act independent review done by an independent child psychologist. That, by the way, is binding on PREMERA. Whatever the result is, if they say cover it, PREMERA does. If they say don't, PREMERA cannot. And that child psychologist is here to help us in this moment for the reasons, Judge Clifton, that you say. We are not child and adolescent psychologists. And we have multiple of them looking at these claims, every single one of them concluding that the criteria for medical necessity is not met. One of the things that was very troubling to those child psychologists is that Luleen was extensively leaving the facility and not under residential treatment care during that time, which was evidence that was dispositive that she could have been treated at a lower level of care. Every one of those reviewers, and I want to reemphasize this, they say that she should be treated, but she should be treated at one of the lower levels of intensity for her own therapeutic benefit. So she needs partial hospitalization, community health treatment, or outpatient treatment. And that is the right treatment for her. That is the correct treatment for her. Very well. Ms. Payton, your time is up. Let me ask my colleague whether either has additional questions for you. We do not. I do not. I have an improper question, but curiosity impels me. How is Lily and Jonathan doing? I mean, this is five years later, so I'm just hopeful on a human level that there's good news. Yeah, no, she's doing better. She's doing better. It's a struggle. This is a tough thing for any adolescent to go through. And as is common, I represent a lot of folks in these cases, Your Honor, and as common in these cases, the struggle continues. But doing a lot better than she was at the time. Thank you for asking. I appreciate that. It doesn't make the case any easier, but it might relieve the burden a little bit. We deal with some sad cases, and this is certainly one of them. It is. Thanks to you both, the counsel, for your argument. Very helpful. The case of Ted Podar v. Primero, Blue Cross Blue Shield of Alaska is submitted.
judges: Fisher, Clifton, M. Smith